SHAHOOD, J.
This is an appeal by appellants, M.A. Hajianpour, M.D., P.A., M.A. Hajianpour, M.D. (collectively, Hajianpour), and Zoya Physical Therapy and Rehabilitation Center, Inc. (Zoya), from the Final Judgment for Damages Upon Counterclaim in favor of appellees, Khosrow Maleki, P.A., and Khosrow Maleki, M.D. (collectively, Ma-leki). We reverse and remand with directions to the trial court to enter an amended final judgment in favor of appellants, Hajianpour and Zoya.
This action was instituted by Hajianp-our’s filing of an action for declaratory relief seeking a determination of the parties’ respective rights under an employment agreement between Hajianpour and Maleki. Maleki filed a counterclaim for anticipatory breach of contract, fraud, declaratory judgment, and breach of contract. The trial court granted summary judgment in favor of Hajianpour on all issues. On review, this court reversed, directing the trial court to enter judgment in favor of Maleki. See Khosrow Maleki, P.A v. M.A. Hajianpour, M.D., P.A., 771 So.2d 628 (Fla. 4th DCA 2000).
Pursuant to the mandate, the trial court entered summary judgment in favor of Maleki on all liability issues. The determination of damages was set for trial, with the issue of damages for fraud being severed from the issue of damages based on breach of contract, anticipatory breach of contract, and declaratory judgment.
The jury found that Maleki’s damages as a result of Hajianpour’s breach of contract were $1,850,000 as of September 1, 1992. In accordance with the verdict, the trial court entered a Partial Judgment for Damages Upon Counterclaim in favor of Maleki in the amount of $1,850,000, with prejudgment interest in the amount of $2,188,408.47. Thereafter, Maleki voluntarily dismissed his fraud claim. Final Judgment was entered in favor of Maleki in the total amount of $4,037,858.47.
The decisive issue at trial and in this appeal was the value of Hajianpour’s medical practice. Each doctor in this case presented a different theory supporting its valuation of the practice. Appellants urge that the trial court erred in allowing valuation testimony that was incompetent and relied upon speculation and unfounded assumption.
Maleki’s expert was James E. McNulty, Ph.D. (McNulty). He is a professor of finance at Florida Atlantic University and holds various degrees in corporate finance and economics. Valuation of stocks and companies is a subject he regularly teaches. When Maleki sought to have McNulty qualified as an expert witness, Hajianpour objected on the basis that he had once been found incompetent to testify in a federal court. After McNulty testified that the issue in the federal case referred to by Hajianpour related to student loans and had nothing to do with the issues in this case, the court declared him to be an expert.
Of the two or three methods of determining the value of closely held stock, the principal one, and the one utilized by McNulty in this case, is the discounted cash flow method. McNulty was engaged by Maleki in 1997 and asked to calculate the “hypothetical value of the stock, assuming that the breach of contract had not occurred.” In performing this task, McNulty reviewed the financial statements of the practice, Medical ECONOMICS, statements of Hajianpour, financial statements of Zoya, information data from the Bureau of Labor Statistics, interest rate information from the Federal Reserve database, Hajianpour’s deposition, Maleki’s deposition, the agreement between the parties, *462 and information gathered from a phone conversation with Maleki in 1997.
Because the contract assumed an ongoing relationship between Maleki and Ha-jianpour, McNulty’s valuation was based on that assumption even though “it’s a hypothetical because the contract was breached.” The discount rate which McNulty used was fifteen percent, higher than the bond rate of seven and a half percent because of the greater risk inherent in investing in stocks. Based on labor information, McNulty calculated a twelve percent growth rate in the company.
McNulty assumed that these two physicians would continue in practice for twenty years, despite the fact that neither one of them had a long term employment agreement or a non-compete agreement with the P.A. He was unable to explain any factual basis for his assumption that they would practice together for twenty years. By assuming a rapid increase in their practice, he calculated that in the year 2012, which was twenty years after the breach of contract, these two physicians would be together grossing $18.7 million, and they would each be earning $5 million a year after taxes. He then discounted their earnings to somehow find that the value of all of the stock of the P.A. as of September 1, 1992, was $12 million. He then testified that one-half of the stock, which plaintiff was entitled under the agreement to purchase for $50,000, had a value of $6 million. He refused to consider the fact that from 1992, until the trial in 2004, neither of these physicians had ever earned more than $600,000 in one year.
On cross-examination, McNulty admitted that he assumed in his valuation an ongoing business even though he knew there was not one because the litigation began in July 1992. He assumed no breach and did not consider whether a buyer would buy a business in litigation. McNulty did not consider the present or future impact of competing practices.
Hajianpour’s attorney questioned McNulty as to how he could conclude that Hajianpour, who obtained his medical license in 1988 and borrowed $100,000 to start his practice, could turn that into an $8,000,000 business in only three years. McNulty responded that the valuation included the efforts of both of the doctors and, in part, took into consideration the various HMO contracts the doctors had obtained. McNulty did not, however, review any of the contracts to determine their value. Any information gathered about the contracts was given to him by Maleki; it was his understanding that Ha-jianpour did not produce the documents.
McNulty rejected counsel’s suggestions that the doctors could have sold the business for $8,000,000 if, as he says, there was a market for it. McNulty explained that that figure was the value of the business as an ongoing business with those two doctors. It was not necessarily the price a buyer would pay to buy the practice without those doctors. He stated that the figures he came up with were not out of line with the national income average for orthopedic surgeons according to data from Medical Eoonomics.
McNulty agreed that valuation is “an art rather than a science” and that ten different experts might have ten different opinions. McNulty had no personal knowledge of an orthopedic practice ever selling at the price he estimated for this one. In addition, prior to this case, he had never valued a professional association provider of medical services.
Hajianpour argues that it was error to allow Maleki’s expert to use a valuation method that was based on conjecture and speculation. We agree.
*463 In Thompson v. Thompson, 576 So.2d 267, 268 (Fla.1991), the supreme court addressed the following certified question: “In marriage dissolution proceedings to which an owner of a professional association is a party, may the value of the professional association’s goodwill be factored in in determining the professional association’s value?” The court answered the question with a “qualified affirmative.” Id.
“Goodwill” is the “advantage or benefit a business has beyond the value of its property and capital.” Id. Goodwill attaches to, and is dependent upon an existing business entity; it has a value “independent of the continued presence or reputation of any particular individual.” Id. at 269, 270. A person’s reputation and skill is not a component of goodwill. Id. With regard to valuing the goodwill of a business, the Thompson court approved the fair market value approach, and directed that “it be the exclusive method of measuring the goodwill of a professional association.” Id. at 270. The fair market value approach is what a willing buyer would pay and what a willing seller would accept for the sale of a business absent any duress. Id. “The excess over assets would represent goodwill.... Actual comparable sales are not required, so long as a rehable and reasonable basis exists for an expert to form an opinion.” Id. Under Thompson, a valuation of enterprise goodwill may not be “predicated on the principal’s continued involvement in the business” or the principal’s agreement to refrain from participating in any like or competing business. See Held v. Held, 912 So.2d 637 (Fla. 4th DCA 2005).
Hajianpour relies upon Thompson and the cases citing Thompson, all dissolution cases, to support his position that the trial court erred in allowing McNulty to base his opinion on the two doctors’ continuing involvement in the business.
Hajianpour’s analysis is premised on the partnership between the doctors terminating as of September 1992. In that context, courts have logically rejected valuations that include personal goodwill because that aspect is really “probable future earning capacity,” not relevant in dividing property for a dissolution. Thompson, 576 So.2d at 270. McNulty’s valuation, on the other hand, assumed an ongoing practice with continuing future income because those were the terms of the agreement, absent a breach. Hajianpour argues that his June 1992 letter terminating the agreement requires a valuation which does not assume an ongoing partnership or business relationship. He is correct. See Thompson.
Dr. Henry Fishkind (Fishkind), an economist, was Hajianpour’s expert. He had previously evaluated three medical practices. In this particular ease, Fishkind felt that a discounted cash flow analysis was not appropriate because it assumes a future income stream and, in his opinion, based on the fact that the doctors were already fighting, they would not continue the business relationship and generate future income. He did agree, however, that, based on the agreement, it did appear that the parties intended an ongoing relationship. Instead, he used a fair market analysis, finding it to be more appropriate when there is uncertainty as to whether this would be an ongoing entity. In doing so, he reviewed the personal tax returns from both of the doctors, the tax returns of the business, the financial statements from the business, the employment agreement, McNulty’s report and deposition, and comparable information about other medical practices that sold in 1992.
Fishkind testified that he did not believe that a willing buyer would have paid for the practice because it could not reasonably be viewed as an ongoing business. The only thing of value, according to Fish- *464 kind, was the liquidation value of the assets. Although he agreed that the revenue was impressive, approximately $400,000 to $500,000 per year per doctor, it was entirely dependent on those two doctors and there was no employment agreement in place requiring them to continue in that practice. Fishkind did not believe that the business had any value independent of the doctors. With regard to Zoya, Fishkind determined that its net book value was $28,558. Fishkind also pointed to the fact that, since the breach, Maleki continued to practice and earned a great deal of money. In Fishkind’s opinion, Maleki had mitigated any and all damages he might have sustained as a result of the breach and was entitled to nothing.
On cross-examination, Fishkind was asked to assume the doctors were getting along and intended to continue in business together. Based on that assumption, he was asked whether he would use a discounted cash flow analysis. He answered, “no, I wouldn’t use the discounted cash flow.”
When the expert’s opinion is based on speculation and conjecture, not supported by the facts, or not arrived at by recognized methodology, the testimony will be stricken. See Sun Bank/N. Fla., N.A. v. Edmunds, 624 So.2d 753 (Fla. 1st DCA 1993); see also Petticrew v. Petticrew, 586 So.2d 508 (Fla. 5th DCA 1991).
As stated in Division of Administration v. Samter, 393 So.2d 1142, 1145 (Fla. 4th DCA 1981), “no weight may be accorded an expert opinion which is totally conclusory in nature and is unsupported by any discernible, factually-based chain of underlying reasoning.” We, therefore, hold in this case, it was error to admit the testimony of Maleki’s expert.
Further, as this court held in Teca, Inc. v. WM-TAB, Inc., 726 So.2d 828, 830 (Fla. 4th DCA 1999), in an en banc decision: “Because there was no proof at trial under the correct measure of damages, we reverse the final judgment and remand for the entry of a judgment for [appellants].”
Because we are reversing on this issue, it is not necessary, and we decline, to discuss the other issues raised by appellants.

Reversed.

KLEIN and TAYLOR, JJ., concur.