CIKLIN, J.
 

 This appeal arises from a complex commercial case involving a failed business relationship between Fidelity Warranty Services, Inc. and Jim Moran & Associates, Inc. (collectively referred to as “JMA”), on the one hand, and Firstate Insurance Holdings, Inc., Firstate Insurance by Eldridge, Inc., Firstate Insurance Company of Puerto Rico, Inc., Charles El-dridge, and Rene Eldridge (collectively referred to as “Firstate”) on the other hand. After a four-week trial, a jury returned a verdict in Firstate’s favor on its counterclaims for tortious interference and defamation and found that Firstate was entitled to a combined $6,750,000 on these two counts. The jury rejected all other claims and counterclaims.
 

 JMA now raises four issues on appeal: (1) that the trial court erred in permitting Charles Eldridge (a co-owner of Firstate and party to this suit) to testify regarding the “market value” of his insurance agency; (2) that its motion for a directed verdict on Firstate’s counterclaim for defamation should have been granted because Firstate failed to prove any actionable defamatory statements made by JMA; (3) that its motion for a directed verdict on Firstate’s tortious interference claim should have been granted because Firstate failed to show any improper conduct by JMA; and (4) that it is entitled to a new trial on its contractual claims because the trial court erred in permitting parol evidence with regard to the parties’ written agreement. Firstate has cross-appealed arguing that it is entitled to prejudgment interest on its tortious interference damages award.
 

 We find that JMA’s fourth contention lacks merit and affirm the trial court’s judgment on all of JMA’s contract claims. We agree with JMA, however, that Firs-tate failed to present proof at trial on the correct measure of damages for its tor-tious interference claim and that Firstate failed to present evidence of any actionable statements attributable to JMA on its defamation claim. We therefore reverse and remand with directions to the trial court to enter a final judgment in favor of JMA on Firstate’s defamation and tortious interference claims. We affirm the final judgment as to all other counts. This disposition makes it unnecessary for us to address JMA’s third contention or to address Firs-tate’s cross-appeal regarding its entitlement to prejudgment interest.
 

 Background
 

 In May 2001, JMA and Firstate entered into an Administrative Agreement (the “Agreement”) under which Firstate would market and sell JMA’s automotive extend
 
 *509
 
 ed warranty service contracts
 
 [1]
 
 in Puerto Rico. Under the Agreement, JMA was responsible for processing any claims on the service contracts should a customer’s automobile need a covered repair, and JMA bore the sole risk of loss should the repair costs exceed the paid premiums. Firstate had responsibility for both marketing the program to dealers and finding banks to finance the purchase of the contracts. Contract payments were to be made directly to Firstate which in turn was responsible for making a remittance payment to JMA. Finally, the agreement permitted either party to terminate the contract for any reason upon ninety days’ written notice, or, in the case of a “material ] breach,” upon immediate written notice.
 

 Soon thereafter, a dispute arose between the parties regarding when Firstate was required to make payments to JMA. Firs-tate contended that payments were not due until after the banks funded the contracts which could take up to sixty days in Puerto Rico (as opposed to the United States where contracts were usually funded within days). JMA claimed that Firs-tate’s payments to it were due within fifteen days after the end of the month in which the sales were reported regardless of when the contract was actually funded. As a result of this dispute, JMA’s books showed a growing accounts receivable due from Firstate.
 

 By about March 2003, JMA alleged that Firstate’s debt to it had grown to over $600,000. As a result, JMA threatened to cancel the Agreement if Firstate did not agree to amended terms. In May 2003, the parties entered into a fourth amendment to the Agreement and Firstate signed a promissory note showing that it owed $537,169 to JMA. Under the amended agreement, dealers and banks would make all checks directly payable to JMA, and Firstate would hold all proceeds “in a fiduciary capacity for JMA” until it deposited them into JMA’s account. The amended agreement also permitted JMA to apply Firstate’s share of the proceeds to reduce the note balance and to send to Firstate the amounts owed for dealer commissions, which Firstate was obligated to pay to the dealers within forty-eight hours of receipt.
 

 The relationship after entering into this amended agreement deteriorated further, and on October 27, 2003, JMA notified Firstate that it was terminating the Agreement, effective immediately, alleging that Firstate had materially breached the Agreement. The parties’ theories as to what happened that led up to JMA terminating the Agreement vastly differed. JMA contended that Firstate continued to fall behind on its payments, failed to report that it still received checks made directly to Firstate, diverted funds into its own account, and failed to disburse dealer commissions within forty-eight hours. Firstate, on the other hand, alleged that JMA had devised a scheme to seize control over Firstate’s program by essentially cutting out Firstate as the middleman. Firs-tate alleged that JMA’s complaints regarding Firstate’s untimely payments were part of the scheme to give JMA the opportunity to cancel the contract without giving Firstate the ninety days’ notice as required by the Agreement.
 

 In December 2003, JMA filed suit against Firstate alleging that Firstate had diverted funds contractually owed to JMA. JMA asserted claims for breach of con
 
 *510
 
 tract, breach of a promissory note, breach of fiduciary duty, conversion, and open account. Firstate filed a counterclaim asserting claims for breach of contract, tor-tious interference with business relations, fraud in the inducement, civil theft, deceptive and unfair trade practices, defamation, infringement of trade name, and breach of fiduciary duty.
 
 [2]
 
 JMA filed multiple motions for summary judgment which were denied — except for a motion to limit Firs-tate’s damages on its breach-of-contract counterclaim to ninety days’ worth of commissions.
 

 The case was tried before a jury beginning in late October 2008. The trial lasted about four weeks. Several issues arose during the course of the trial which are at issue in this appeal.
 

 As to its counterclaim, Firstate sought to establish damages through its proposed expert, Ronald Patella, on the theory that JMA’s immediate termination without ninety days’ notice, and other alleged bad acts, had destroyed Firstate’s business. After JMA moved to exclude Patella’s testimony, Patella gave a proffer that, under the “income approach” to business valuation, Firstate had been worth $9,124,787 as of October 27, 2003 — the date that JMA terminated the Agreement. That figure, however, was based on a projection of lost profits for five years into the future. Because JMA possessed the right to terminate for any reason with ninety days’ notice, the trial court agreed that any future income more than ninety days out was too speculative and excluded Patella’s testimony. Firstate then requested a short recess to determine if its expert could testify as to the value of Firstate’s business based on either an asset value or market value analysis. JMA argued that permitting the expert to change his opinion midstream would be highly prejudicial.
 

 After a break, however, counsel returned and announced that Firstate’s intention had “always” been to establish “business destruction” damages through a “market value analysis” offered by Charles Eldridge (the co-owner of the insurance agency). JMA objected that this theory of damages was an entirely new one and that JMA would be unfairly prejudiced if the trial court permitted Firstate to change its damages analysis in the middle of trial. Reasoning that the owner of property can always testify to what he or she believes the value of the property to be, the trial court permitted Eldridge to testify, subject to Firstate’s making Eldridge available for a mid-afternoon deposition.
 

 After having deposed Eldridge, JMA renewed its objections to his testifying. JMA argued that if Eldridge were permitted to testify, JMA would need to delay the trial for a little more than one week to prepare its own expert rebuttal. The trial court determined that it would resolve this issue by refusing to permit “any expert testimony at all with respect to this new proposed theory.” Eldridge was then permitted to testify.
 

 After explaining that he had thirty years’ experience as an insurance agent, Eldridge testified that the “market value” of an insurance agency is determined by multiplying the previous year’s gross commissions by a multiplier somewhere between one and three. Eldridge then proceeded to review an unaudited financial statement covering the previous six months of Firstate’s business in Puerto Rico, “annualized” the commissions by doubling the value reported in the financial
 
 *511
 
 statement, and then tripled the annualized figure, resulting in an estimated net worth of $6,579,006. Eldridge justified his application of a triple multiplier on the ground that Firstate was a “niche” agency. El-dridge further testified that he had bought and sold insurance agencies more than ten times and had used this valuation methodology in those transactions.
 

 With regard to Firstate’s defamation claim, Firstate read into evidence from the deposition transcript of one dealer representative concerning a single allegedly defamatory statement. That representative, Joseph Aixala of San Juan Suzuki, testified that, when he asked Juan Gonzalez, a JMA salesman, about the outstanding commissions that were owed to the dealership, Gonzalez claimed that “[JMA] ha[d] paid Firstate and Firstate was using fraudulent rates and there was a problem with the rates.” Gonzalez then explained that, whereas Suzuki’s vehicles were “class two” automobiles, Firstate had erroneously classified them as “class one,” resulting in an improperly low contract price. Aixala acknowledged that he understood the “fraudulent rates” statement to refer to a business dispute relating to rate classification — and he subsequently demanded that
 
 both
 
 parties resolve their disagreement and make payment to his dealership. Aix-ala also testified that, while he subsequently decided to stop doing business with Firstate, that decision had nothing to do with the “fraudulent rates” statement.
 

 At the end of the parties’ cases-in-chief and Firstate’s defense, JMA moved for a directed verdict on each count of Firstate’s counterclaim. The trial court granted a directed verdict on the counts for fraudulent inducement, civil theft, deceptive and unfair trade practices, and infringement of trade name. The trial court ultimately denied JMA’s motion for directed verdict as to defamation and tortious interference.
 

 The jury rejected all of JMA’s claims. The jury also rejected Firstate’s counterclaims for breach of contract and breach of fiduciary duty, but it awarded Firstate $3.25 million for tortious interference and $2.5 million for defamation (consisting of $1.5 million in general damages and $1 million in punitive damages). The trial court denied JMA’s post-trial motions for relief, including a motion for judgment in accordance with its earlier directed-verdict motions.
 

 Prior to the trial court entering a final judgment, Firstate filed a motion to tax prejudgment interest which the trial court denied. Subsequently, the trial court entered a final judgment based on the jury verdict. JMA filed a timely notice of appeal and Firstate filed a cross-appeal. This appeal follows.
 

 Market Value of Firstate
 

 JMA argues that the trial court erred in allowing Eldridge, one of Firs-tate’s owners, to testify to the market value of his company as of October 27, 2003— the date that JMA terminated the Agreement. JMA contends that Firstate “ambushed” JMA by asking the trial court mid-trial to permit Eldridge’s undisclosed testimony regarding his opinion as to the value of Firstate. Furthermore, JMA also contends that Eldridge’s testimony should have been excluded because it was based on speculation and conjecture. We agree that in this case Eldridge was testifying as an expert witness, and that his testimony should have been excluded both because Firstate had failed to properly disclose it during pretrial discovery and because it was too speculative.
 

 The trial court ruled that it would permit Eldridge to testify to his opinion as to what his property was worth, but that it would not permit any “expert” to testify on the issue:
 

 
 *512
 
 THE COURT: I am not going to permit any expert testimony at all with respect to this new proposed theory, so [Firstate’s expert] will not testify on it. However, as an owner, I will permit the testimony that he believes, Mr. Eldridge believes that his agency was worth X on the theory an owner can always express an opinion as to what they believe the value of the property is. So I will permit Mr. Eldridge to testify as to what he thinks his business was worth. An owner can basically testify.
 

 The error in the trial court’s analysis was that Eldridge’s testimony was more than just that of an “owner” testifying to the value of his property.
 
 See Trailer Ranch, Inc. v. Levine,
 
 523 So.2d 629, 632 (Fla. 4th DCA 1988) (“An owner may ordinarily testify as to the value of property owned.”). The Florida Evidence Code provides that a lay witness cannot offer opinion testimony when, among other limitations, the opinion requires “a special knowledge, skill, experience, or training.”
 
 See
 
 § 90.701(2), Fla. Stat. (2008). Otherwise, a witness can only give opinion testimony if the witness is “qualified as an expert by knowledge, skill, experience, training, or education.”
 
 See
 
 § 90.702, Fla. Stat. (2008).
 

 Here, Eldridge’s testimony turned into “expert” testimony when he claimed to have specialized knowledge regarding the proper mathematical formula which should be used to calculate the market value of a niche insurance agency in Puerto Rico. He further testified that he acquired this knowledge through thirty years’ experience as an agent in the insurance industry and that he had bought and sold insurance agencies more than ten times in the past using the same valuation methodology.
 

 Thus, Mr. Eldridge was testifying not to just having knowledge of the value of his own property, but also to having specialized knowledge of the insurance agency market in Puerto Rico acquired through his experience in the industry. This is the very essence of expert testimony.
 

 We have consistently held that surprise, changed, or undisclosed expert testimony may result in prejudice sufficient to require a new trial.
 
 See, e.g., Belmont v. N. Broward Hosp. Dist.,
 
 727 So.2d 992, 994 (Fla. 4th DCA 1999) (reversing judgment and remanding for new trial where defendant doctors surprised and prejudiced plaintiff by altering their previous testimony in the middle of trial);
 
 Office Depot, Inc. v. Miller,
 
 584 So.2d 587, 590-91 (Fla. 4th DCA 1991) (affirming order granting new trial on basis of surprise where, during trial, expert witness “recanted” his opinion given during discovery). We believe that the same rules apply where an owner of property is testifying to the value of that property based not just on his or her familiarity with the property, but also on his or her specialized knowledge. Otherwise, a party could circumvent the discovery and disclosure rules aimed to protect parties from “trial by ambush.”
 

 In
 
 Belmont,
 
 we reversed and found that the trial court erred in permitting two defendant physicians to change them opinions midstream during the trial. 727 So.2d at 994. This court wrote, “We are not impressed with defendant’s argument that [the physicians] were parties, not expert witnesses, and that this was factual, not opinion, testimony. The issue of the condition of the aorta was clearly opinion evidence.”
 
 Id.
 
 Likewise, here Eldridge’s status as party to this lawsuit does not change the prejudice that resulted from Firstate’s failure to disclose in pretrial discovery the nature of his testimony. Also, as in
 
 Belmont,
 
 Eldridge’s testimony was clearly opinion evidence.
 

 The trial court attempted to cure any prejudice to JMA by allowing JMA to first
 
 *513
 
 conduct a mid-trial deposition of Eldridge to question him on his previously undisclosed theory as to the market value of Firstate on the date that JMA terminated the Agreement. However, the mid-trial deposition here was insufficient to cure the prejudice because the only way JMA could have countered the testimony was through its own expert testimony.
 
 See, e.g., Grau v. Branham,
 
 626 So.2d 1059, 1061 (Fla. 4th DCA 1993) (“[Wjhile the depositions of the experts regarding their mid-trial examinations allowed the defendants to know what they would testify when asked in trial, they did not allow the defendants to counter such testimony with sufficient expert testimony of their own”).
 

 Thus, while it would have been within the trial court’s discretion to completely exclude Eldridge’s testimony, the trial court erred in denying JMA the opportunity to present its own expert testimony in rebuttal once it decided to allow Eldridge to testify.
 
 See id.
 
 In this case, JMA specifically asked for time to consult with an expert witness and possibly offer rebuttal testimony through the same expert witness. The trial court denied this request, apparently believing that the mid-trial deposition of Eldridge and preventing Firs-tate from presenting other expert testimony in support of Eldridge’s theory was sufficient to cure the prejudice.
 
 [3]
 

 Generally, after finding that a trial court erroneously failed to cure the prejudice caused by surprise, changed or undisclosed expert testimony, we would reverse and remand for a new trial.
 
 See, e.g., Dep’t of Health and Rehabilitative Servs. v. J.B.,
 
 675 So.2d 241, 244 (Fla. 4th DCA 1996).
 
 [4]
 
 In this case, however, El-dridge’s testimony, even if it had been properly disclosed, should have been excluded because it was based on speculation and conjecture.
 
 See M.A. Hajianpour, M.D., P.A. v. Khosrow Maleki, P.A.,
 
 932 So.2d 459, 464 (Fla. 4th DCA 2006) (“When the expert’s opinion is based on speculation and conjecture, not supported by the facts, or not arrived at by recognized methodology, the testimony will be stricken.”).
 

 At trial, Firstate claimed that its business was completely destroyed as a result of JMA’s tortious interference with Firstate’s business relationships with dealerships and banks in Puerto Rico. “If a
 
 *514
 
 business is completely destroyed, the proper total measure of damages is the market value of the business on the date of the loss.”
 
 Montage Grp., Ltd. v. Athle-Tech Computer Sys., Inc.,
 
 889 So.2d 180, 193 (Fla. 2d DCA 2004) (citing
 
 Polyglycoat Corp. v. Hirsch Distribs., Inc.,
 
 442 So.2d 958, 960 (Fla. 4th DCA 1983)).
 

 To prove the market value of Firstate’s business on the date of loss, Firstate proffered the testimony of its properly disclosed expert witness, Patella, who claimed that under the income-based approach
 
 [5]
 
 to business valuation, Firstate had been worth $9,124,787 as of October 27, 2003. To calculate that figure, however, Patella used projected lost profits for five years into the future. Because JMA possessed the right to terminate for any reason with ninety days’ notice, the trial court agreed with JMA that any future income more than ninety days out was too speculative and excluded Patella’s testimony.
 

 The trial court indicated that it would consider Patella’s testimony if he could base his valuation on either an asset-based approach or a market-based approach. After a break, Firstate argued that instead of asking Patella to analyze the business value of its insurance agency on the date of loss, it was going to have Eldridge (one of its co-owners) testify to the agency’s business value using a market-based approach. After a mid-trial deposition and proffer of Eldridge’s testimony, the trial court permitted Eldridge to testify that the market value of insurance agencies is determined by multiplying the previous year’s gross commissions by a multiplier. Eldridge testified that he had “recently” purchased an insurance agency in Puerto Rico using this methodology and a multiplier of two. Eldridge claimed that a higher multiplier (three) should be used in this case because Firstate was a “niche” agency. Eldridge then took Firstate’s gross commissions from the previous six months and doubled it to get an annualized value. He multiplied these annualized commissions by three to get a market value of $6,579,006.
 

 Eldridge’s valuation methodology suffered from the same defects as Patella’s income-based valuation.
 
 [6]
 
 “It is as inappropriate to use purely speculative forecasts of future revenue to determine the market value of a business as it is to use such speculative forecasts in determining lost
 
 *515
 
 future profits.”
 
 Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.,
 
 921 So.2d 43, 46 (Fla. 3d DCA 2006);
 
 see also Parc Royale E. Dev., Inc. v. U.S. Project Mgmt., Inc.,
 
 38 So.3d 865, 869 (Fla. 4th DCA 2010) (finding that trial court erred “by allowing the expert to testify to damages based upon a faulty factual foundation that the trial court had already declared to be inadmissible”). As such, the trial court erred by allowing Eldridge’s market-value testimony and by denying JMA’s motion for a directed verdict on its tortious interference claim because of Firstate’s failure to prove any damages.
 

 In sum, Firstate failed to meet its burden of proving the market value of its insurance agency on October 27, 2003 as it was required to do to support its claim that JMA’s tortious conduct resulted in the complete destruction of its business. Because there was no proof presented at trial on the correct measure of damages, the trial court should have granted JMA’s motion for directed verdict on the tortious interference counterclaim.
 
 See Morgan Stanley & Co. v. Coleman (Parent) Holdings Inc.,
 
 955 So.2d 1124, 1131 (Fla. 4th DCA 2007);
 
 M.A. Hajianpour, M.D., P.A.,
 
 932 So.2d at 464;
 
 Teca, Inc. v. WM-TAB, Inc.,
 
 726 So.2d 828, 830 (Fla. 4th DCA 1999) (en banc) (holding that a plaintiff is not entitled to “a second bite at the apple when there has been no proof at trial concerning the correct measure of damages”). We therefore reverse the final judgment for tortious interference and remand for entry of a judgment for JMA on this count.
 

 Defamation
 

 JMA claims that Firstate’s counterclaim for defamation was based on a single statement, namely, that Firstate was charging “fraudulent rates,” made by a JMA salesman to a representative from a car dealership. JMA argues that when read in context, this statement constituted pure opinion because the JMA salesman immediately divulged the underlying facts, the dealer representative acknowledged that he interpreted the statement to mean there was a contract dispute between JMA and Firstate (as opposed to an allegation of criminal conduct), and the dealer representative also testified that the comment did not influence him in any way. We agree.
 

 The standard for reviewing a trial court’s ruling on a motion for directed verdict is de novo.
 
 Meruelo v. Mark Andrew of Palm Beaches, Ltd.,
 
 12 So.3d 247, 250 (Fla. 4th DCA 2009). “[A]n appellate court must affirm the denial of a motion for directed verdict if any reasonable view of the evidence could sustain a verdict in favor of the non-moving party.”
 
 Id.
 

 A party cannot recover for defamation based on statements which are pure opinion.
 
 See Morse v. Ripken,
 
 707 So.2d 921, 922 (Fla. 4th DCA 1998). “To determine whether a statement is actionable, the court must examine it in the context in which it was published.”
 
 Id.
 
 This means that the court should “consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.”
 
 Id.
 
 Furthermore, a “statement is pure opinion, as a matter of law, when it is based on facts which are otherwise known or available to the reader or listener.”
 
 Razner v. Wellington Reg’l Med. Ctr., Inc.,
 
 837 So.2d 437, 442 (Fla. 4th DCA 2002).
 

 Here, read in its full context, the statement which Aixala, the Suzuki dealer, testified that the JMA sales representatives had made to him, clearly constituted an opinion. First, Aixala testified that the JMA sales representatives explained to him the underlying facts to their claim that “Firstate was using fraudulent rates”:
 

 
 *516
 
 Question: And did they indicate what the fraudulent rates were, what they were or what that was about?
 

 Answer: They claimed that Suzuki was a class two automobile and Firstate has classified it as a class one.
 

 During the same deposition, in response to Firstate’s counsel’s question as to whether the allegation that Firstate was charging fraudulent rates was one of the reasons that the Suzuki dealership decided to work directly with JMA instead of Firs-tate, Aixala responded: “No. I figured that Firstate and JM & A were having some differences and it would be a matter of time.”
 

 Thus, considering that the statement in this case was “published” to an audience of one, that the underlying facts were explained to that party, that the recipient of the message indicated that he interpreted the statement as nothing more than a contractual business dispute between Firstate and JMA, and that there was no evidence presented that Aixala ever repeated this statement to anyone else, we find that the JMA’s statement that Firstate was charging fraudulent rates was pure opinion and therefore not actionable. As such, the trial court erred in not granting JMA’s motion for a directed verdict on Firstate’s defamation claim.
 

 On appeal, Firstate now alleges that the following testimony from one of its officers also supported its defamation counterclaim against JMA:
 

 Well, one of the [automobile] dealers ... told our customer service rep when we went there, oh, Chuck [Eldridge] must be in big trouble for stealing half a million dollars, or for taking all that money. And our corporate rep said, you know, what are you talking about. And he said, oh, no, like — how could he have found out, or got this information, or the idea that Firstate and Chuck had stolen — and Chuck in particular — had stolen all this money, after the JM & A people went there and visited them?
 

 Aside from the clear hearsay problems with this statement, the officer’s testimony is insufficient to support defamation because it contains no proof that JMA ever made a statement to anyone. Inferring from this testimony alone that JMA had originally made a defamatory statement to the dealer would be pure conjecture and speculation.
 
 See Stanley v. Marceaux,
 
 991 So.2d 938, 940 (Fla. 4th DCA 2008) (“The rule that an inference may not be stacked on another inference is designed to protect litigants from verdicts based upon conjecture and speculation.”).
 

 Conclusion
 

 In summary, we find that the trial court erred in denying JMA’s motion for directed verdict on Firstate’s counterclaim for tortious interference and defamation. We reverse those portions of the trial court’s order awarding damages to Firstate on its tortious interference and defamation counts and remand with instructions to the trial court to direct a verdict for JMA on those counts. This disposition renders Firstate’s cross-appeal on the issue of prejudgment interest moot. We affirm the judgment as to all other counts.
 

 Affirmed in part, reversed in part, and remanded with instructions.
 

 GROSS and HAZOURI, JJ., concur.
 

 [1]
 

 . The extended service warranty contracts were described by the parties as an insurance product that provides coverage for automotive service and repair upon expiration of a vehicle’s factory warranty.
 

 [2]
 

 . Firstate also included a claim for civil conspiracy to commit tortious interference, but the trial court entered a stipulated order granting judgment to JMA on this claim before trial.
 

 [3]
 

 . We folly appreciate the difficult situation that the trial court faced. The trial court was likely concerned that it would be error to prevent Eldridge from testifying as to the value of his own business. The trial court also apparently recognized the prejudice to JMA as Firstate was attempting to use this undisclosed testimony to circumvent objections that JMA would make if Firstate had its disclosed expert change his theory of valuation mid-trial. The trial had already been ongoing for three weeks when this issue arose, and JMA had indicated that it would need to delay the end of the trial by at least one week to prepare its own expert rebuttal. The trial court likely believed that such a delay would cause a substantial disruption in the orderly and efficient trial of the case. We believe, however, that had the trial court recognized that Eldridge was effectively testifying as an expert, it would have excluded Eldridge’s testimony.
 
 See Binger v. King Pest Control,
 
 401 So.2d 1310, 1314 (Fla.1981) ("Other factors which may enter into the trial court’s exercise of discretion are: (i) the objecting party’s ability to cure the prejudice ...; (ii) the calling party’s possible intentional, or bad faith, noncompliance with the pretrial order; and (iii) the possible disruption of the orderly and efficient trial of the case (or other cases).”).
 

 [4]
 

 . As Eldridge’s testimony regarding the market value of Firstate’s insurance agency in Puerto Rico was only relevant in determining the amount of damages (as opposed to liability), we would have remanded for a new trial on damages only.
 
 See J.B.,
 
 675 So.2d at 244 ("Since the basis of this court’s reversal was testimony affecting damages, we remand for a retrial on damages only.”).
 

 [5]
 

 . Florida courts have recognized three valuation methods for determining the value of a business.
 
 See Sys. Components Corp. v. Fla. Dep't of Transp.,
 
 14 So.3d 967, 979-80 (Fla.2009). First, the income-based approach values the business based on the predicted current and future revenue streams discounted to a total present value.
 
 Id.
 
 at 980. A market-based approach values the business based on a comparison to comparable businesses existing in the particular market adjusted for the individual characteristics and risks associated with the specific business.
 
 Id.
 
 Third, an asset-based approach values the business based on its total assets minus its total liabilities and is typically used when the business is not profitable.
 
 Id.
 

 [6]
 

 . Although Eldridge claimed to be using the previous year’s commissions rather than future profits to value the company, the previous year’s commissions in Eldridge’s calculation were being used as a predictor of future profit. As such, Eldridge’s methodology was at its core the same income-based methodology that the trial court had already found to be too speculative. We note that for Eldridge to use a "market-based” approach, he would have had to compare Firstate's value to that of other insurance agencies in Puerto Rico and adjust for the individual characteristics and risks associated with each business. We would expect this to include an analysis of any risk associated with all of its commissions coming from a single insurer with which the agency had a troubled relationship and where the agreement with that insurer was terminable-at-will with ninety days’ notice.