DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**SCOTT HERMAN** and **CRAIG COOPER,** directly and derivatively on behalf of **OXYLIFE RESPIRATORY SERVICES, LLC,**
Appellants/Cross-Appellees,

v.

**GARY EWERS, GERRI McGIGHAN-LUKENS,** and **OXYLIFE RESPIRATORY SERVICES, LLC,**
Appellees/Cross-Appellants.

Nos. 4D2024-0940, 4D2024-1057, and 4D2024-1167

[December 17, 2025]

Appeal and cross-appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Jack B. Tuter, Jr., Judge; L.T. Case No. CACE17-012896.

Elaine D. Walter and Elliot B. Kula of Kula & Associates, P.A., Miami (limited appearance for oral argument), Daniel M. Samson of Samson Appellate Law, Miami, and Ryan M. Clancy and Alec W. Smith of Ainsworth & Clancy, PLLC, Miami, for appellants/cross-appellees.

Joseph T. Eagleton of Brannock Berman & Seider, Tampa (limited appearance for oral argument), Virgil W. Wright, III of Cameron, Hodges, Coleman, LaPointe & Wright, P.A., Ocala, and David A. Fifner of Cameron, Hodges, Coleman, LaPointe & Wright, P.A., Orlando, for appellees/cross-appellants.

GROSS, J.

This case arises from a transaction between experienced businesspersons. The plaintiffs below appeal (1) a final judgment awarding them $418,574.07, less than they sought in the litigation, on their claim for breach of the employment agreements, and (2) an order granting the defendants a judgment notwithstanding the verdict ("JNOV") as to a different claim on which the jury had awarded the plaintiffs $2.75 million. The defendants cross-appeal the final judgment.

We affirm the final judgment on the claim for breach of the employment agreements, but we reverse the judgment notwithstanding the verdict for the reasons stated below.

### Background—The Employment Agreement and Letter of Intent

Defendant OxyLife Respiratory Services, LLC ("OxyLife") is a licensed provider of home medical equipment subject to various state and federal regulations. On August 1, 2015, plaintiffs Craig Cooper and Scott Herman entered into identical employment agreements with OxyLife. The two agreements provided that the plaintiffs would receive no salary but instead would be compensated through profit-share distributions and potential ownership interests. The employment agreements also provided that, in determining profit-share distributions, "sales shall be calculated from cash received from the payors and patients."

The employment agreements contemplated that the plaintiffs would operate a Consignment Nebulizer Program ("CNP") as a distinct business unit within OxyLife. Both agreements included a survival clause with respect to profit-share distributions: "[Each plaintiff's] profit share distribution payments shall survive his employment with OxyLife regardless of circumstance and reason for his departure, whether termination from OxyLife is voluntary, involuntary, for cause or without cause."

The employment agreements provided in Section 6 that the "CNP shall be owned by three parties immediately without a vesting period"— specifically, 33.34% to OxyLife and 33.33% to each of the plaintiffs. Section 6 also included a survival clause stating that each plaintiff's "ownership interest in CNP shall survive his employment with OxyLife regardless of circumstance and reason for his departure, whether termination from OxyLife is voluntary, involuntary, for cause or without cause." Section 6C stated that the parties "shall make best efforts to form a subsidiary . . . and apply as a Florida home medical equipment provider by December 31, 2015." Section 6C further provided: "Should subsidiary not be formed, above ownership interests shall remain for CNP within OxyLife Respiratory Services, LLC until such time when the subsidiary is created."

Although CNP was profitable, OxyLife faced financial troubles in May 2016.

2

In July 2016, the plaintiffs entered into a "Letter of Intent" (also "Letter") with OxyLife's owners, defendants Gary Ewers and Gerri McGighan-Lukens, which outlined terms for the plaintiffs to acquire a 50% ownership interest in OxyLife. The Letter established a "Trigger Date" for ownership vesting, defined as the first day of the month following three consecutive months during which the company achieved all of the following: (a) positive cash flows; (b) "current with suppliers (determination based on individual supplier payment terms)"; and (c) current with all existing liabilities.

### *The Plaintiffs' Ouster*

Cooper testified that the CNP business had been profitable from around August 2015 to May 2017. Similarly, Ewers conceded at trial that the plaintiffs made OxyLife more profitable from 2016 through mid-2017. When asked if the company made "significant strides" under the plaintiffs' leadership, Ewers acknowledged that "we made improvement." After being confronted with his deposition testimony, Ewers reluctantly acknowledged that "if I said significant back then, I guess I -- I would qualify it as significant now."

Cooper also testified that OxyLife achieved cash flow positivity, became current with suppliers, and was current with liabilities. Cooper believed that the plaintiffs had complied or substantially complied with the Letter of Intent's three "Trigger Date" requirements.

Nonetheless, the plaintiffs contended that on the eve of the self-executing "Trigger Date" when they were set to vest their 50% ownership in OxyLife, the defendants wrongfully repudiated the employment agreements and Letter of Intent.

Around June 2017, the defendants changed the plaintiffs' passwords and prevented them from accessing OxyLife's computer systems. According to Cooper, OxyLife's financial books had been "manipulated in a way to show that CNP was unprofitable," even though "it had been profitable for the prior 18 months."

The plaintiffs were ultimately terminated in November 2017. The plaintiffs' accountant testified that the defendants owed the plaintiffs $418,574.07 for unpaid monies related to the CNP from May 2017 through November 2017.

The plaintiffs filed multiple complaints, culminating in a fourth amended complaint in which they asserted fourteen claims, including breach of the employment agreements, breach of the Letter of Intent,

wrongful repudiation, specific performance, negligent misrepresentation, equitable accounting, quantum meruit, constructive trust, and breach of fiduciary duty.

The defendants brought a counterclaim asserting breach of a noncompete, breach of a confidentiality agreement, and failure to return property.

### *Order Determining that the Plaintiffs were Employees*

The plaintiffs filed an Amended Motion for Final Determination of Consignment Nebulizer Program Status and Ownership, seeking a ruling that the CNP operated as a partnership and that the plaintiffs each had a 1/3 ownership interest.

Following a non-jury evidentiary hearing, the trial court denied the plaintiffs' motion in July 2020, ruling that the plaintiffs were employees of OxyLife and that no partnership existed. The court found that the employment agreements were the best evidence of the parties' intent. The court ruled that any contributions made by the plaintiffs with respect to the CNP were in their capacity as employees of OxyLife. Relying on Section 6 of the employment agreements, the court reasoned that the viability of the plaintiffs' ownership interest in the CNP was predicated on the parties using their best efforts to form a subsidiary and applying for a Florida home medical license. The court noted that the plaintiffs "did not obtain this license to operate the CNP." The court further reasoned that "the CNP constitutes an association whose formation is governed by statute" and thus "the CNP is not a partnership."

### *Summary Judgment Proceedings and Related Orders*

The plaintiffs moved for partial summary judgment, arguing that the survival clauses in their employment agreements entitled them to ongoing profit distributions even after termination and that OxyLife materially breached the contract as a matter of law by ceasing payments around June 2017.

The defendants filed a motion and a renewed motion for summary judgment on the Letter of Intent, arguing that the plaintiffs failed to meet the "Trigger Date" conditions of the Letter because the evidence showed that OxyLife had not been current with suppliers or all existing liabilities for three consecutive months.

The trial court granted in part and denied in part the parties' motions for summary judgment.

The court denied the plaintiffs' motion for summary judgment "as to whether there was a material breach." The court found that a valid contract existed but, based on its July 2020 order, concluded that the plaintiffs were employees under the employment agreements. The court disagreed with the plaintiffs' position that, even as "employees," they were entitled to be paid their share of proceeds from the employment agreements even after their employment had been terminated. The court reasoned: "First, their only entitlement is to 'wages' as employees of the company. When they decided to leave the company, they were no longer entitled to employee wages." The court further noted: "Any notion they could be paid wages would seem to violate the rule against perpetuities." The court then quoted an excerpt of the statutory rule against perpetuities, emphasizing the words "personal property" in the rule. The court went on to conclude that the plaintiffs' damages would be "limited to those damages they may have been entitled to while they were employees of the company."

As for the defendants' motion for summary judgment related to the "Trigger Date," the court denied the motion because it contained "factual disputes not conducive to summary judgment."

The plaintiffs moved for partial reconsideration as to the trial court's determination that the plaintiffs receiving wages after their termination "would seem to violate the rule against perpetuities."

The trial court's denial of the motion for reconsideration backed away from the earlier mention of the rule against perpetuities. The court clarified that **"[t]he Court did not make a ruling that the rule against perpetuities was violated, only that it would seem to violate the rule**." (emphasis and comma added). The court elaborated: "What the Court did rule for the last time is the plaintiffs were employees -- wage earners -- and any notion they could continue to be paid wages after they terminated their employment is baseless."

The trial court later entered an Order on Plaintiffs' Most Recent Motion Regarding Damages, finding that "the Plaintiffs are employees and as such are entitled to employee wages from the time they were employed until the time they left the company," but "are NOT entitled to ownership benefits post-employment such as profit sharing or other compensation reserved for owners of a company." The court noted that it was the plaintiffs who, "years ago," had asked the court to determine whether they were owners

5

or employees—an issue the court decided "after a lengthy evidentiary hearing." Therefore, the court ruled that the motion would be "yet again DENIED" and that "no such proof will be permitted at trial."

### *The Trial*

After excessive motion practice, the case proceeded to a jury trial in January 2024 on two claims: (1) breach of the employment agreements and (2) breach of the Letter of Intent.

Plaintiff Cooper, who became OxyLife's CEO after the Letter of Intent was executed, testified about the Durable Medical Equipment (DME) industry, including barriers to entry and valuation practices. Cooper explained that a DME license would cost at least "a couple hundred thousand dollars" and that DME companies typically sold for two times annual revenue. Cooper testified that he was familiar with OxyLife's financials, including profit and loss statements, payroll, and inventory. Between 2015 and 2017, Cooper explained, OxyLife had annual sales ranging from $3.5 million to $5 million. Cooper also testified that OxyLife's annual revenue was approximately $4.2 million in 2017.

Defendant Ewers, co-owner of OxyLife, testified that he purchased the company for $3.5 million in 2008 and that it was still worth $3.5 million in 2016. He acknowledged that the plaintiffs made OxyLife more profitable between mid-2016 and June 2017.

The defendants moved for directed verdict at the close of the plaintiffs' case on the claim for breach of the Letter of Intent, but the trial court took the matter under advisement.

During the plaintiffs' initial closing argument, the plaintiffs' attorney did not discuss valuation methodology or present a detailed damages analysis. In rebuttal closing, the plaintiffs' counsel accurately mentioned that Ewers had testified that he bought OxyLife for $3.5 million, but the plaintiffs' counsel mistakenly stated that Ewers had testified that the company was worth at least $3.5 million "today." The plaintiffs' counsel later suggested that the jury could award $1.75 million for breach of the Letter of Intent, representing half of a $3.5 million valuation of OxyLife.

During deliberations, the jury submitted a written question: "What is the value of the company OxyLife in 2024?" The trial court expressed frustration, noting that the relevant valuation date was 2017—the year the plaintiffs were ousted—and that the value of the company in 2024 was an improper measure of damages. The court declined the plaintiffs'

suggestion that the jury should be told to "focus on the value in 2017." The court noted that if the jury came up with "a value of OxyLife in 2024, I will take the verdict away."

After further discussion with counsel, the trial court responded to the jury's question with a written note stating, "I am unable to answer this question." The defendants then renewed their motion for directed verdict on the claim for breach of the Letter of Intent.

### *Verdict*

The jury returned a verdict in favor of the plaintiffs on both claims. The jury awarded the plaintiffs $418,574.07 for breach of the employment agreements for the May-November 2017 period. The jury also awarded the plaintiffs $2.75 million for breach of the Letter of Intent, apparently valuing OxyLife at double that amount.

### *Post-Trial Proceedings*

The plaintiffs moved for a new trial on the claim for breach of the employment agreements, arguing that the jury should have been permitted to consider post-termination profit distributions in determining damages.

The defendants moved for judgment notwithstanding the verdict (JNOV) and for a new trial, arguing in relevant part that the plaintiffs had failed to present competent evidence of damages for breach of the Letter of Intent. The defendants asserted that the plaintiffs had "failed to present expert testimony regarding company valuation" or "any evidence regarding the company value in 2017."

The trial court denied the plaintiffs' motion for new trial on the claim for breach of the employment agreements, but the court ordered further briefing on whether the jury's $2.75 million damages award for breach of the Letter of Intent was supported by the evidence.

### *Final Order, Final Judgment, and Denial of Rehearing*

The trial court entered a Final Order Denying Plaintiffs' Motion for New Trial and Granting in Part and Denying in Part Defendants' Motion for Judgment Notwithstanding the Verdict.

The court ruled that the plaintiffs' claims for damages relating to the Letter of Intent "were not supported by competent substantial evidence" because the plaintiffs "failed to establish competent evidence of the value

7

of the business on the date they claim the breach occurred"—namely, the 2017 ouster date.

The court found that the plaintiffs had failed to present expert testimony regarding the company's valuation or any evidence of its value in 2017. Citing section 607.1301 et seq., Florida Statutes, the court stated that the "valuation of a business requires expert testimony." Additionally, the court concluded that Cooper's and Ewers's "opinions were not competent evidence for the jury to consider," relying upon *Fidelity Warranty Services, Inc. v. Firstate Insurance Holdings, Inc.*, 74 So. 3d 506 (Fla. 4th DCA 2011).

The court granted the defendants' motion for JNOV as to breach of the Letter of Intent but denied the parties' other post-trial motions. The court entered a final judgment awarding the plaintiffs $418,574.07 against OxyLife, consistent with the jury's verdict on the claim for breach of the employment agreements.

### *The Trial Court Properly Denied the Plaintiffs' Motion for New Trial for Breach of the Employment Agreements*

On appeal, the plaintiffs argue that the trial court erred by applying the rule against perpetuities to employment contracts that provided for vested payments even after the plaintiffs left the company.

We reject that argument because the trial court expressly denied that the rule against perpetuities was a basis for its ruling. The court stated that its decision was grounded solely on the determination that employees cannot receive wages post-employment.

The plaintiffs' initial brief raises no challenge to the trial court's 2020 ruling that they were employees. Point I of the plaintiffs' initial brief focuses almost exclusively on the rule against perpetuities. Importantly, the initial brief makes only a cursory argument that the trial court "effectively wrote the Survivorship Clause out of the contract" by ruling that they "could not be paid anything" post-employment, which they contend "is contrary to established law." Such a superficial, conclusory argument on this point was insufficient to present this issue for appellate review.

In *Lynn v. City of Fort Lauderdale*, 81 So. 2d 511, 513 (Fla. 1955), the Florida Supreme Court held that an appellant's duty to establish reversible error is not discharged "by merely posing a question with an accompanying assertion that it was improperly answered in the court below and then

8

dumping the matter into the lap of the appellate court for decision." The "duty rests upon the appealing party to make error clearly appear." *Id.*; *accord Congress Park Office Condos II LLC v. First-Citizens Bank & Tr. Co.*, 105 So. 3d 602, 610 (Fla. 4th DCA 2013) (quoting *Lynn*); *Spanakos v. Hawk Sys. Inc.*, 362 So. 3d 226, 245 (Fla. 4th DCA 2023) (same).

For the first time in their reply brief, the plaintiffs raise a litany of new challenges to the trial court's rulings regarding the survival clause and their ownership status. But under Florida law, "[a]n issue not raised in an initial brief is deemed abandoned and may not be raised for the first time in a reply brief." *Hoskins v. State*, 75 So. 3d 250, 257 (Fla. 2011) (citation omitted). Therefore, the plaintiffs waived any challenges to the trial court's rulings raised for the first time in their reply brief.[1]

We affirm the judgment on the claim involving breach of the employment agreements. We have considered the defendants' argument of cumulative error on the cross-appeal but find no reversible error.

### *The Trial Court Erred in Granting the Judgment Notwithstanding the Verdict Because There was Substantial Competent Evidence to Support a Proper Valuation of OxyLife*

We agree with the plaintiffs' argument that the trial court erred in granting a JNOV because the defendant owner's own testimony provided competent, substantial evidence of damages.

A JNOV is reviewed de novo. *Citizens Prop. Ins. Corp. v. Hernandez*, 360 So. 3d 737, 740 (Fla. 4th DCA 2023). We "must view all of the evidence in a light most favorable to the non-movant, and, in the face of evidence which is at odds or contradictory, all conflicts must be resolved in favor of the party against whom the motion has been made." *Collins v. Sch. Bd. of Broward Cnty.*, 471 So. 2d 560, 563 (Fla. 4th DCA 1985). "Only where there is no evidence upon which a jury could properly rely, in finding for the plaintiff, should a directed verdict be granted." *Id.* The authority to enter a directed verdict "must be exercised with great caution" because it encroaches upon a litigant's right to a jury trial. *Marcano v. Puhalovich*, 362 So. 2d 439, 441 (Fla. 4th DCA 1978).

*Discussion*

---

[1] Although Ms. Walter appeared on behalf of the plaintiffs at oral argument, she did not participate in the plaintiffs' briefing for this court.

"Damages for a breach of contract should be measured as of the date of the breach[,]" *Grossman Holdings Ltd. v. Hourihan*, 414 So. 2d 1037, 1040 (Fla. 1982), but this "is not an inflexible principle[.]" *Lindon v. Dalton Hotel Corp.*, 49 So. 3d 299, 306 (Fla. 5th DCA 2010).

As a general rule, "an owner of property is qualified as such to testify to the value of his property[.]" *Mercury Marine Div. of Brunswick Corp. v. Boat Town U.S.A., Inc.*, 444 So. 2d 88, 90 (Fla. 4th DCA 1984). Such testimony is generally permitted even when the owner is "not qualified as an expert." *Salvage & Surplus, Inc. v. Weintraub*, 131 So. 2d 515, 516 (Fla. 3d DCA 1961). Likewise, if a corporate officer "is qualified by virtue of his experience, his management of the affairs of the corporation and his knowledge of relevant value he is also a competent witness as to value." *Mercury Marine*, 444 So. 2d at 90.

Our decision in *Fidelity Warranty* represents an exception to *Mercury Marine*'s general rule. In *Fidelity Warranty*, we held that an owner's testimony as to the value of his business was speculative and crossed into expert opinion. 74 So. 3d at 511–13. Although we recognized the rule that an owner may ordinarily testify to the value of his property, we explained that the testimony at issue was "more than just that of an 'owner' testifying to the value of his property" because he relied on "specialized knowledge regarding the proper mathematical formula" that "should be used to calculate the market value of a niche insurance agency in Puerto Rico." *Id.* at 512. Specifically, the owner testified that "the 'market value' of an insurance agency is determined by multiplying the previous year's gross commissions by a multiplier somewhere between one and three." *Id.* at 510. The owner then "annualized" the previous six months of commissions and applied a multiplier of three to arrive at an estimated value of around $6.5 million, justifying the higher multiplier on the ground that the business was a "niche" agency. *Id.* at 510–11.

On appeal, we concluded that, even if the owner's testimony had been properly disclosed, it should have been excluded because it was "based on speculation and conjecture." *Id.* at 513. The owner's testimony was "the very essence of expert testimony," this court reasoned, because he "was testifying not to just having knowledge of the value of his own property, but also to having specialized knowledge of the insurance agency market in Puerto Rico acquired through his experience in the industry." *Id.* at 512. We also noted that the owner's testimony suffered from another defect: "Although [the owner] claimed to be using the previous year's commissions rather than future profits to value the company, the previous year's commissions in [the owner's] calculation were being used as a predictor of future profit." *Id.* at 514 n.6. We explained: "It is as

inappropriate to use purely speculative forecasts of future revenue to determine the market value of a business as it is to use such speculative forecasts in determining lost future profits." *Id.* at 514–15 (quoting *Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 921 So. 2d 43, 46 (Fla. 3d DCA 2006)). Thus, we concluded that the trial court erred by allowing the owner's market-value testimony and by denying a motion for a directed verdict due to the business's "failure to prove any damages." *Id.* at 515.

In this case, unlike the situation in *Fidelity Warranty*, defendant Ewers's admissions provided competent, substantial evidence that OxyLife was worth at least $3.5 million in 2017. While plaintiff Cooper's testimony did not constitute competent, substantial evidence of OxyLife's value in 2017, Ewers's testimony was legally sufficient evidence of the correct measure of damages.

First, the trial court correctly rejected Cooper's testimony regarding the value of OxyLife, applying *Fidelity Warranty*. While Florida law permits corporate officers and owners to testify as to value based on personal knowledge of the business, Cooper's testimony crossed the line from permissible lay testimony of a corporate officer into impermissible expert opinion because it relied upon "specialized knowledge regarding the proper mathematical formula" that "should be used to calculate the market value" of a DME company. Cooper's valuation methodology of applying a standard 2x multiplier to annual revenue is materially indistinguishable from the testimony condemned in *Fidelity Warranty*, where the owner used a 3x multiplier on gross annualized commissions to value a niche insurance agency. *Fidelity Warranty* cannot be distinguished based on the supposed "complexity" of the formula in that case.

Here, similar to the owner in *Fidelity Warranty*, Cooper was relying upon specialized knowledge of the DME market acquired through his experience in the industry. In other words, Cooper offered testimony that was not merely based on his management of OxyLife, but rather was based on a specialized valuation formula in the industry, thereby venturing beyond the scope of permissible lay opinion. Absent a showing that Cooper was an expert, his testimony regarding the typical 2x revenue multiplier for valuing DME companies was impermissible speculation.

On the other hand, Ewers's testimony falls squarely within the general rule that a business owner may testify to the value of his company. Ewers testified that he purchased OxyLife for $3.5 million in 2008 and that the company retained that value in 2016. Ewers's testimony that OxyLife was still worth $3.5 million in 2016 was significant, as the evidence also showed that OxyLife was facing financial difficulties that year. Although

11

Ewers did not directly opine as to the value of OxyLife in 2017, he acknowledged that the company's profitability had improved by mid-2017 and that the company had made "significant strides" under the plaintiffs' leadership. Thus, a jury could reasonably infer from Ewers's testimony that, if the company was worth $3.5 million in 2016 when it was facing financial difficulties, then it was worth at least that much after the plaintiffs had made significant strides in improving its financial performance in 2017.

Unlike Cooper's testimony, Ewers did not apply a mathematical multiplier or rely on a specialized valuation methodology. Instead, he offered an informed assessment of OxyLife's value in his capacity as a co-owner, consistent with the long-standing principle that an owner of property is qualified to testify to the property's value. Ewers's opinion was based in large part on the amount he actually spent to purchase OxyLife in a free market transaction. Thus, Ewers's admissions constituted competent, substantial evidence and would have been sufficient to support a jury finding that OxyLife's value was at least $3.5 million in 2017. For that reason, at the close of the evidence, sufficient evidence of damages existed to withstand the motion for directed verdict on damages and present the breach of the Letter of Intent claim to the jury.

The trial court's reliance upon section 607.1301, et seq., Florida Statutes, was misplaced. As the plaintiffs argue, nothing in the statutes governing shareholder appraisal rights precludes officers and owners from testifying as to value in other types of commercial litigation.

"[C]ourts have drawn a distinction between cases in which the plaintiff submitted some evidence of damages and cases where there has been a complete failure of proof on the issue." *Evans v. HSBC Bank, USA, Nat'l Ass'n*, 223 So. 3d 1059, 1063 (Fla. 2d DCA 2017). This was not a case where the plaintiffs failed to meet their burden of establishing the correct measure of damages, thereby precluding a "second bite at the apple." *See*, *e.g.*, *Bandklayder Dev., LLC v. Sabga*, 406 So. 3d 265, 270 (Fla. 3d DCA 2025); *Morton's of Chicago, Inc. v. Lira*, 48 So. 3d 76, 80 (Fla. 1st DCA 2010).

Rather, this was a case where the jury awarded damages exceeding the amount proven by competent, substantial evidence, so the appropriate remedy would have been to grant a remittitur or a new trial on damages. In *Great American Insurance Co. of N.Y. v. Suarez*, 146 So. 644, 648 (Fla. 1932), the Florida Supreme Court observed:

> In cases where *some* legal liability is shown by the record brought here on writ of error, but it is plainly apparent from that same record that under no circumstances could the court justifiably under the law uphold the amount of damages allowed by the jury in that particular case . . . the practice here is in general to affirm the judgment as to the *liability* shown, *and permit a voluntary remittitur by the prevailing party to purge the judgment of obviously excessive damages*[.]

(third emphasis added); *see also Love Realty Corp. v. O'Brien*, 162 So. 2d 532, 533 (Fla. 2d DCA 1964) (holding that remittitur was the appropriate remedy where the jury awarded $2,000 but the uncontroverted testimony established that the plaintiff was owed $800).

While the trial court erred in granting a JNOV insofar as Ewers's testimony provided competent, substantial evidence of OxyLife's value in 2017, the full amount of the verdict cannot be upheld. The jury awarded $2.75 million, implying a total company value of $5.5 million, but the only competent evidence of value was Ewers's testimony that OxyLife was still worth $3.5 million in 2016, coupled with his acknowledgment that OxyLife's profitability had improved in 2017. Although Ewers's testimony supports the conclusion that the company was worth at least $3.5 million in 2017, the record lacks any competent evidence supporting the jury's implied valuation of $5.5 million.

For these reasons, we reverse the entry of the JNOV and remand to the circuit court with directions to remit the verdict on Count II to $1.75 million; if any party objects to the remittitur, the court shall conduct a new trial on damages for that count.

*Affirmed in part, reversed in part, and remanded for further proceedings.*

FORST and SHEPHERD, JJ., concur.

\*        \*        \*

**Not final until disposition of timely-filed motion for rehearing.**

13